### R. H. MARTIN, Inc., v. EDWARDS, Collector of Internal Revenue.

(District Court, S. D. New York. March 10, 1922.)

Internal revenue ⊜⟹9—Investment held more than "nominal capital invested," within statute.

Where a corporation, acting as sole selling agent for asbestos mines, settled for domestic shipments, less its commissions, as soon as the invoices could be checked up, but did not guarantee any of the accounts, and also bought and sold merchandise on its own account, the proportion of its gross profits from trading on its own account being 23 per cent. in 1915, 9.8 per cent. in 1916, and 45 per cent. in 1917, its capital in 1917 being over $51,000, it had more than a "nominal capital invested" in the business, and was therefore not within Internal Revenue Act 1917, § 209 (Comp. St. 1918, § 6336⅞j), and Regulations of the Commissioner of Internal Revenue, approved October 3, 1917, arts. 73 and 74, providing for the taxation of businesses having only a nominal capital, and the fact that during the year 1917 it received more than it paid out did not show that it was not using its capital.

At Law. Action by R. H. Martin, Inc., against William H. Edwards, Collector of Internal Revenue, Second District of New York. Judgment for defendant.

George H. Corey, of New York City, for plaintiff.

William Hayward, U. S. Atty., and Richard S. Holmes, Asst. U. S. Atty., both of New York City, and H. M. Darling, Asst. U. S. Atty., of Washington, D. C., for defendant.

AUGUSTUS N. HAND, District Judge. The plaintiff brings this suit to recover the sum of $8,348.50, the amount of an excess profits tax alleged to have been erroneously assessed under the Revenue Act of 1917, and paid to the defendant under protest. The plaintiff corporation acted as sole agent for the Martin Bennett Asbestos Mines, located at Thetford Mines, in the Province of Quebec. Under a written agreement, dated June 14, 1913, made between the Martin Bennett Asbestos Mines and Robert H. Martin, it was provided that invoices and bills of lading for each shipment of ore made by the Martin Bennett Asbestos Mines to its customers were to be sent direct to R. H. Martin, who had no responsibility to effect collection. In the case of export ship-

⊜⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ments, Martin was to remit the amount of his sale, less commissions and interest, as soon as he had negotiated with his bankers the drafts against such shipments. In the case of domestic shipments he was to make settlement by sending his check less commission and interest as soon as the invoice could be properly checked up and accounted.

The written memorandum stated that Martin did not guarantee any of the accounts, and in the event of their not being paid upon the date of maturity he was entitled to charge the whole amount with interest back to the Martin Bennett Asbestos Mines. The foregoing arrangement evidently contemplated that Martin should discount the drafts in the case of foreign shipments and pay the amount of the invoice in case of domestic shipments retaining only his commissions and interest. The plaintiff was organized for the purpose of carrying on the agency business of Robert H. Martin and his son and residuary legatee, Alexander R. Martin. It was incorporated with a capital of $25,000, and assumed the agreement of Robert H. Martin heretofore mentioned, which he had made with the Martin Bennett Asbestos Mines. It paid Alexander R. Martin, as president of the company a salary of $5,000, which was concededly less than the value of his services to the company.

Plaintiff seeks to recover taxes alleged to have been overpaid upon the theory that taxes should have been computed pursuant to section 209 of the Revenue Act of 1917 (Comp. St. 1918, § 6336⅜j). This section provides:

"That in the case of a trade or business having no invested capital or not more than a nominal capital there shall be levied, assessed, collected and paid, in addition to the taxes under existing law and under this act, in lieu of the tax imposed by section two hundred and one, a tax equivalent to eight per centum of the net income of such trade or business in excess of the following deductions: In the case of a domestic corporation $3,000, and in the case of a domestic partnership or a citizen or resident of the United States $6,000; in the case of all other trades or business, no deduction."

Article 73 of the Regulations of the Commissioner of Internal Revenue, approved October 3, 1917, provides that:

"Agents and brokers requiring and using no capital or merely a nominal capital in their business are taxable under article 15 [same as section 209] but commission houses regularly employing a substantial amount of capital, whether to lend to principals or to carry goods on their own account, are not deemed to be agents or brokers. * * *"

Article 74 provides that:

"* * * The term nominal capital as used in section 209 means in general a small or negligible capital whose use in a particular trade or business is incidental. The following will not be construed as business having a nominal capital for purposes of excess profits tax:

"(a) A business which because of conditions arising from the war or exceptional opportunities for profits earns a disproportionately high rate of profits during the taxable year, if it belongs to a class which necessarily and customarily requires capital for its operation. * * *

"(b) Corporations which although their capitalization is nominal employ a substantial amount of capital in their business."

During the year 1915, the plaintiff purchased on its own account merchandise to the amount of $94,021.72, and sold such merchandise for $98,626.31. In 1916, such purchases on its own account amounted

to $47,011.16, and sales on its account amounted to $49,225.66. In 1917 such purchases on its own account amounted to $27,156.55 and sales amounted to $49,289.89.

The plaintiff's capital at the beginning of the year 1917 was $51,074. The plaintiff was obliged under its arrangement to make settlements for domestic shipments by sending its check, less commissions and interest, as soon as the invoices could be properly checked up, and this it did. During the year 1917 its income was derived from the following sources:

| | |
|---|---:|
| Commissions from selling for account of the mines | $26,890.34 |
| Profits from buying and selling on its own account | 22,133.25 |
| Interest | 5,851.90 |
| | $54,875.49 |

If it had limited itself to buying and selling on commission, with a small incidental trading on its own account, the plaintiff's contention would be good; but in the case of this corporation it is evident that there was substantial trading on its own account, and also that it required capital to conduct its business in the way it was conducted. In 1915 the proportion of the gross profits received by the plaintiff for trading on its own account was 23 per cent.; in 1916, 9.8 per cent.; and in 1917, 45 per cent. Its profits during the year 1917 were retained, and not distributed as dividends, and its officers continually made substantial advances besides to aid it in financing the business it conducted. The capital was not used merely to pay the ordinary expenses of the corporation, which were less than $3,000 a month, but to assist in making advances to its principal, for whom it was acting as selling agent, as well as to trade on its own account.

I have indicated above that there was considerable trading by the plaintiff on its own account in 1915–16, so that the large amount of such trading in 1917 cannot be regarded as merely "incidental." See article 74 of Regulations. It is urged that during the year 1917, outside of the months of January and February, when the remittances exceeded the receipts by $6,088, plaintiff was able to conduct its business without resorting to its capital. This argument is based on the fact that, except during those two months, it seems to have received more than it paid out. Its capital was, however, during this very period engaged in its business and being turned over in connection with sales of asbestos. Its advances included capital available or capital repaid from advances. If this is not so, I cannot see where its capital was, or what use was being made of it. On December 31, 1917, when its bank balance was larger than in any other month of the year, it was only $16,501.67, and yet the capital and surplus then appears by the balance sheet to have amounted to $78,330. In its balance sheet of December 31, 1916, out of its assets of $97,842.10, $76,606.47 seems to have represented accounts and bills receivable derived from sales for the account of the mines and sales on its own account; $13,872.50 seems to have represented loans as direct advances to the Mines, before maturity of the bills of customers of the latter to whom plaintiff had sold products of the Mines. The balance sheet of December 31, 1917, indicates

the same sort of situation. Approximately only $16,000 of the capital and surplus, which aggregrated $78,330, was available in the form of cash in bank.

The situation somewhat resembles that in Anderson v. Farmers' Loan & Trust Co. 241 Fed. 322, 154 C. C. A. 202. There it was argued that the Farmers' Loan & Trust Company of New York was not subject to a tax upon capital and surplus employed in banking because there were sufficient investments to exhaust its capital. The trust company unsuccessfully attempted to attribute all its large and varied banking business to the use of assets other than its capital, because there were sufficient permanent investments to exhaust the latter. Here it may be that there were sufficient bills and accounts receivable derived from sale of products of the Mines to offset all loans and advances to the latter, but they had not been collected and the capital of the plaintiff was needed, though temporarily, to make good the advances which were constantly made before the 60 days credits to customers of the Mines had expired and the moneys came in. Every successful business would have its capital, not only unimpaired, but employed, if its outstanding accounts receivable could be at all times liquidated forthwith, but the chief use of capital is to carry it along until the payments come in.

I am of the opinion that the plaintiff had more than a nominal capital and had a substantial invested capital, which was employed in making advances or to or on account of the Mines, and also in buying merchandise on its own account for profitable sale.

A verdict is accordingly directed for the defendant.