FEEDERS SUPPLY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7606.   Promulgated October 17, 1927.

1. Under the facts of this proceeding, *held* that during the year 1917, petitioner was engaged in a trade or business having an invested capital which was more than a nominal capital, and is therefore not entitled to have its profits tax for that year computed under the provisions of section 209 of the Revenue Act of 1917.

2. Certain notes *held* not to have been *bona fide* paid in for stock or shares, under section 326 (a) of the Revenue Act of 1918.

*Theodore B. Benson, Esq.,* and *P. W. Shraeder, Esq.,* for the petitioner.
*J. Arthur Adams, Esq.,* for the respondent.

This is a proceeding for the redetermination of deficiencies in income and profits taxes for the fiscal years ended June 30, 1917, 1918, 1919, and 1920, in the amounts of $9,548.31, $460.35, $1,563.83 and $497.01, respectively. The issues are: (1) Whether petitioner is entitled, for the parts of the fiscal years ended June 30, 1917 and 1918 falling within the year 1917, to have its profits tax computed under the provisions of section 209 of the Revenue Act of 1917, on the ground that it was engaged in a trade or business having no invested

capital or not more than a nominal capital; and (2) whether petitioner is entitled to have included in its invested capital, for the fiscal years ended in 1919, and 1920, the actual cash value of certain notes given by stockholders for shares of stock issued to them.

### FINDINGS OF FACT.

Petitioner is a Missouri corporation, with its principal office at Kansas City. It was organized June 5, 1913, with an authorized capital stock of $5,000, and succeeded to the business theretofore conducted by a partnership under the same name.

During the year 1910, R. D. Nathan and A. R. Hollcroft began the business of buying and selling cottonseed meal and cake and other feed for livestock, principally in carload lots. A. L. Parnham and J. L. Whittington were admitted to the partnership in 1911 and 1912, respectively. Upon organization of the corporation in 1913, the partnership transferred to it assets in the amount of $18,829.34 and liabilities in the amount of $11,366.36. The difference between the assets and liabilities in the amount of $7,462.98 appeared on the opening books of the corporation as $5,000 capital stock and $2,462.98 paid-in surplus.

The incorporators were Nathan, Hollcroft, Parnham and Whittington, and stock was issued to each in proportion to his interest in the partnership. The four incorporators were elected directors, and the directors thereupon elected Nathan president and general manager, Parnham vice president and sales manager, Hollcroft secretary, and Whittington treasurer and traffic manager. These four men held the same offices, performed the same duties and devoted their entire time to the business from the date of incorporation up to and including the fiscal years involved herein.

During 1914, two shares of stock were sold to W. R. White, who was then employed by petitioner as assistant traffic manager. The stock was issued to White by the four incorporators, whose respective shares were reduced in approximately the same proportion. In 1916, one share was issued to C. S. Nathan, who was employed as cashier, and the holdings of the other five stockholders were reduced proportionately.

The petitioner was authorized under its charter to buy, sell and deal in cottonseed products, grain and other similar commodities, cattle, hogs and other live stock; also to borrow money and to acquire and hold land. During the fiscal years ended in 1917 and 1918, petitioner was actually engaged in the business of buying and selling and dealing in cottonseed products, and other feed for live stock. Sales were made either in carload lots shipped directly from the manufacturer to the consumer on petitioner's order, or in less than carload lots shipped from petitioner's warehouse.

In the case of sales in carload lots, petitioner would order the goods shipped by the manufacturer consigned to the petitioner at the customer's railroad station. The manufacturer would draw a sight draft on petitioner, to which was attached the bill of lading covering the shipment. The draft with the bill of lading attached would be sent by the manufacturer through its bank for collection, and would be presented to petitioner in the usual course of business and paid by its check drawn on the Interstate National Bank of Kansas City. Petitioner would thereupon immediately draw a sight draft on its customer, attach thereto the bill of lading and deposit same to its credit in the bank. The draft on the customer would then be sent through the usual channels by the bank for collection, to which the proceeds would be remitted when paid by the customer.

Petitioner's bank accepted such drafts on customers for immediate deposit, without requiring petitioner to give a note, contract or other evidence of indebtedness, but made a charge of $1 per thousand, required petitioner to pay exchange charged by its correspondent banks, and also charged the petitioner interest at the rate of 8 per cent per annum for the number of days elapsing between the dates when the respective drafts were deposited as cash in the checking account of the petitioner and the dates when the proceeds of the collection were received by the bank.

During the taxable years in question, petitioner maintained a warehouse in Kansas City, from which it made shipments of feedstuff to its customers in less than carload lots. It also maintained a sales office at Omaha, Nebr., in charge of Hollcroft. For a time it also maintained a branch office at Forth Worth, Tex.

Advertising expenses for the fiscal year ended in 1917 amounted to $2,972.62, and such expenses for the fiscal year ended in 1918 amounted to $4,932.90.

At July 1, 1916, the beginning of the fiscal year ended June 30, 1917, the assets of the petitioner amounted to $30,191.89, and liabilities to $15,939.34. The net worth in the amount of $14,252.55 represented $5,000 capital stock and $9,252.55 surplus. Of the liabilities, petitioner owed $644.85 to trade creditors, and $13,601.09 to other creditors, of which latter amount $12,865.51 was owed to three of its stockholders, R. D. Nathan, Hollcroft, and White. The invested capital of the petitioner for the fiscal year ended June 30, 1917, was $14,252.55.

During the fiscal year ended June 30, 1917, gross sales made by the petitioner amounted to $2,089,353.25, of which amount $1,811,065.54 was from goods sold in carload lots on sight drafts, and the balance in the amount of $278,287.71 was from sales of goods carried in the petitioner's warehouse, and as to which its books showed opening

and closing inventories. The gross profits from sales amounted to $141,765.41, of which $93,395.17 was realized from sales in carload lots, and $48,370.24 was realized from sales of goods shipped from petitioner's warehouse. Total deductions amounted to $53,673.22, which included $19,171.83 paid in salaries and wages to officers, stockholders and other employees. Net income amounted to $88,692.28.

At July 1, 1917, the beginning of the fiscal year ended June 30, 1918, the assets of the petitioner amounted to $92,807.36, and liabilities to $48,415.38. The net worth in the amount of $44,391.98 represented $5,000 capital stock and $39,391.98 surplus. Of the liabilities, $2,775.85 was owing to trade creditors and $41,556.06 to other creditors. Of the latter amount, $40,076.14 was owing to the six stockholders. Petitioner's invested capital for the fiscal year ended in 1918 was $44,391.98.

During the fiscal year ended June 30, 1918, the gross sales made by petitioner amounted to $2,694,065.79, of which amount $2,164,-232.91 was from goods sold in carload lots on sight drafts, and the balance in the amount of $529,832.88 was from sales of goods shipped from petitioner's warehouse, as to which its books showed opening and closing inventories. The gross profits from sales amounted to $144,349.66, of which $65,941.86 was from sales in carload lots, and $78,407.80 was from sales of goods shipped from the warehouse. Total deductions amounted to $99,464.73, which included $58,311.97 paid as salaries and wages to officers, stockholders, and other employees, and the net income amounted to $46,502.33.

At July 1, 1918, the beginning of the fiscal year ended June 30, 1919, petitioner's assets amounted to $130,468.95, and its liabilities to $46,759.04. The net worth of $83,709.04 represented $5,000 capital stock and $78,709.04 surplus.

During the fiscal year 1919, the petitioner decided to and did commence the manufacture of feed products. To that end, it purchased the necessary real estate, constructed a manufacturing plant and installed machinery therein. The plant began operations during the fiscal year ended June 30, 1920.

On August 31, 1918, petitioner made an application for and was granted authority to increase its common stock from $5,000 to $125,000, and to issue preferred stock in the amount of $50,000. The full amount of the authorized additional common stock was issued in the amount of $120,000. Of the authorized issue of preferred stock, in the amount of $50,000, only the amount of $35,000 was actually issued. The preferred stock was issued to holders of common stock to discharge loans, R. D. Nathan receiving 200 shares, A. R. Hollcroft 140 shares and C. S. Nathan 10 shares, and was paid

for by charges against amounts owed to them by the petitioner. Of the $120,000 additional authorized common stock, $75,000 was paid for by the stockholders through a stock dividend, no actual cash being paid in. The additional common stock was issued to the stockholders in proportion to their previous stockholdings. Under date of September 5, 1918, the balance of the additional common stock in the amount of $45,000 was issued for the subscriber's notes, as follows:

| | Shares | Amount |
|---|---|---|
| Certificate— | | |
| No. 20 to J. L. Whittington | 42.336 | $4,233.60 |
| No. 21 to W. R. White | 17.640 | 1,764.00 |
| No. 22 to A. R. Hollcroft | 76.2048 | 7,620.48 |
| No. 23 to R. D. Nathan | 76.2048 | 7,620.48 |
| No. 24 to Bessie Nathan | 76.2048 | 7,620.48 |
| No. 25 to A. L. Parnham | 76.2048 | 7,620.48 |
| No. 26 to Lora M. Parnham | 76.2048 | 7,620.48 |
| No. 27 to C. S. Nathan | 9.0000 | 900.00 |
| | 450.0000 | 45,000.00 |

The notes given for the stock were in the usual form of promissory notes, dated September 5, 1918, payable to petitioner 12 months after date, with interest from date at the rate of 6 per cent per annum, and were secured by the stock certificates attached thereto. The note for $7,620.48 given for the certificate of stock issued to Lora M. Parnham, wife of A. L. Parnham, was paid in full at the approximate rate of $350 per month by charges to the account of A. L. Parnham carried on petitioner's books. When this note became due on September 5, 1919, the total sum of $3,500 had been paid and credited thereon. Payments were made on the other notes to the extent of cash dividends in the amount of $13,686.29 declared by petitioner on July 19, 1920. Of the total amount of the notes, $21,306.77 was paid by charges to the personal accounts of the makers. The unpaid balance of the notes, in the amount of $23,693.23, was canceled December 30, 1921, and a proportionate amount of the stock issued therefor was canceled by petitioner, pursuant to the following resolution:

RESOLUTION ADOPTED AT MEETING OF BOARD OF DIRECTORS, DEC. 13, 1921, RELATIVE TO CANCELLATION OF PART OF STOCK ISSUED FOR NOTES

BE IT RESOLVED by the Feeders' Supply Company, that—

WHEREAS, on or about September 5, 1918, the Feeders' Supply Company did sell and cause to be issued under certificate 23, 76.2048 shares of the common stock of this Company and did accept in full payment thereof promissory note for $7,620.48 of R. D. Nathan dated on or about September 5, 1918, due one year after date with interest at six (6) per cent after September 5, 1918, said stock being held as collateral to said note; and

WHEREAS, there has been paid upon said note, after making allowance for all interest to date, approximately thirty (30) per cent of the principal of said note; and

WHEREAS, it is to the interest of this Company to dispose of said note and cause to be returned to this Company as much of said stock as is reasonably possible;

Now, THEREFORE, this offer be and is hereby made to the said R. D. Nathan, or to whomsoever may own the said stock collateral to said note at the time of the acceptance of this offer, said offer to be good for acceptance up to and including January 20, 1922: That this Company will issue to the said R. D. Nathan, or his assigns, twenty (20) per cent of the par value of said collateral stock as fully paid and non-assessable and cancel said note, the Company to retain all the payments made upon said note, and there to be returned to the Company as its property eighty (80) per cent of said collateral stock. Acceptance of and compliance with this offer to be full settlement and discharge between the Company and said R. D. Nathan, or his assigns, as to this transaction.

It was moved and seconded that said resolution be adopted, and after thorough discussion the same was adopted by the unanimous vote of A. L. Parnham, J. L. Wittington and A. R. Hollcroft, R. D. Nathan not voting.

(Resolutions of the same tenor and purport were adopted in respect of notes signed by W. R. White, C. S. Nathan, J. L. Wittington, A. L. Parnham and A. R. Hollcroft.)

Interest was paid on the notes from their date to the date of cancellation, during which time the stockholders had personal accounts on petitioner's books, to which were credited salaries, dividends, cash advances and other items, together with interest thereon, for which petitioner was indebted to them, and against which accounts were charged payments of cash to or on behalf of such stockholders and other items, together with interest thereon, for which the stockholders were indebted to the petitioner. The makers of the notes were financially responsible and able at all times to pay them.

During each of the fiscal years ended June 30, 1919 and 1920, interest was paid on borrowed money used in the business of petitioner.

OPINION.

TRAMMELL: The facts of this proceeding, as set out in our findings hereinabove, are not in dispute. The parties differ only in the application of the law thereto, and under the pleadings, two issues of such nature are presented for decision here.

*First issue.* Is petitioner entitled, for those parts of the fiscal years ended in 1917 and 1918 falling within the calendar year 1917, to have its profits tax computed under the provisions of section 209 of the Revenue Act of 1917?

Petitioner made its tax returns on the basis of fiscal years ended June 30, and contends that for the parts of the fiscal years 1917 and 1918 falling within the year 1917, it is entitled to have its excess-profits tax computed at the rate of 8 per cent as provided in section

209 of the 1917 act, on the ground that it was engaged in a trade or business having no invested capital or not more than a nominal capital. Upon audit of petitioner's returns for the years in question, respondent computed the profits tax under section 210 of said act, and denies that the petitioner is entitled to assessment under section 209. That part of the statute, applicable here, reads as follows:

SEC. 209. That in the case of a trade or business having no invested capital or not more than a nominal capital there shall be levied, assessed, collected and paid, in addition to the taxes under existing law and under this Act, in lieu of the tax imposed by section two hundred and one, a tax equivalent to eight per centum of the net income of such trade or business * * *.

The respondent contends that the word "invested" was purposely omitted in connection with the phrase "not more than a nominal capital" and should not be construed to mean "not more than a nominal *invested* capital." In harmony with this construction, respondent urges that in determining whether petitioner had not more than a nominal capital, all kinds of capital used by it must be considered, including borrowed money, credits, and inadmissible and other assets. Section 207 of the 1917 Act defines "invested capital" and specifically excludes therefrom "money and other property borrowed," but does not define "nominal capital."

It will be unnecessary to answer this question and pass on the construction of the statute urged by the respondent in order to decide the issue raised if, under the facts of the instant case, it can fairly be said that the petitioner's invested capital in and of itself was more than "a nominal capital." If the petitioner's invested capital was more than nominal, it is obvious that to add thereto the amount of capital borrowed would not tend to bring the petitioner within the classification sought.

Do the facts, then, justify the conclusion that the petitioner's invested capital constituted "not more than a nominal capital"? Petitioner urges that the answer to this question should be in the affirmative, for the reason, as stated in its brief, that its invested capital was out of all proportion to the exigencies of the business and ridiculously small in comparison with the gross sales.

The ratio which invested capital bears to gross sales we do not conceive to be a proper criterion for determining whether such capital is nominal or otherwise. The word "nominal" is defined in Black's Law Dictionary, 2d ed., p. 821, as meaning "titular; existing in name only; not real or substantial; connected with the transaction or proceeding in name only, not in interest."

It is readily apparent that a trade or business might have a substantial invested capital, which because of rapid turnover, might

bear a small ratio to gross sales. The true measure for determining the relative importance of invested capital it seems to us lies in whether or not it is used directly and to a substantial extent in producing the profits or income of the business. This view has been adopted by the courts in numerous cases.

In *Park Amusement Co.* v. *McCaughn*, 14 Fed. (2d) 553; 5 Am. Fed. Tax Rep. 6155, the court, in considering this question, said:

> The real criterion is in the fact finding of whether money as an income producer played any real and substantial part in producing the income to be taxed. Each tub must thus stand on its own bottom, and the sole question becomes how the facts stand here.

In *Hubbard-Ragsdale Co.* v. *Dean*, 15 Fed. (2d) 410, affd. 15 Fed. (2d) 1013, the trial court said:

> Under section 209 of the Revenue Act of 1917 * * * a different, though somewhat analogous, question was repeatedly presented in determining whether a trade or business had "not more than a nominal capital." Under that law the invested capital was considered as merely nominal, if it was used solely as a fund from which to advance salaries, wages, etc., and to provide office furniture, accommodations, and equipment. Under such circumstances it played no integral part in the actual production of income. It was incidental to the earning power of the corporation, which functioned independently of it. *De Laski, etc.,* v. *Iredell, Collector,* (D. C.) 268 F. 377; affirmed 290 F. 955 (C. C. A. 3). But where the use of capital served a direct and necessary function in carrying on a business as it was in fact carried on, it was not to be classified as merely nominal.

Cf. *R. H. Martin, Inc.* v. *Edwards*, 293 Fed. 258; 4 Am. Fed. Tax Rep. 3634; *Cartier* v. *Doyle*, 277 Fed. 150; 2 Am. Fed. Tax Rep. 1580.

In *De Laski, etc., Tire Co.* v. *Iredell*, 268 Fed. 377; 2 Am. Fed. Tax Rep. 1266; affd. 290 Fed. 955; 2 Am. Fed. Tax Rep. 1993, it was held that a corporation whose sole business was the granting of licenses under its patents and collecting the income therefrom, having a capital of $10,000, which it used to provide its office and furniture and equipment and to maintain its organization between the royalty payments, had not more than a nominal capital within the meaning of section 209 of the Revenue Act of 1917. The facts of the case disclose that the capital of the corporation was not used directly in the production of the taxable income.

In *Lincoln Chemical Co.* v. *Edwards*, 289 Fed. 458, the facts were that the only asset of the taxpayer corporation was a secret process, which was intangible and of no value in April, 1909, but that thereafter money was expended in developing the process, so that in 1917 the corporation had a surplus above its capital stock. The corporation had an authorized capital stock of $10,000 and an earned surplus of at least $2,000. The invested capital, represented by the improved secret process, was used directly in producing the taxable

income. The court held that the corporation had more than a nominal "invested capital."

We also have heretofore followed this same rule in *J. J. O'Connor & Co.* 1 B. T. A. 1021, and *Rice & Fielding, Inc.*, 3 B. T. A. 1080.

The business conducted by the petitioner herein during the fiscal years 1917 and 1918 was sharply divided into two classes: First, that part which consisted of the sales of goods shipped by the manufacturer directly to the consumer on bills of lading attached to sight drafts. This class of business petitioner handled on borrowed capital, under the circumstances set out in our findings of fact. The second class consisted of the sales of goods shipped from the petitioner's warehouse, with respect to which petitioner's books showed opening and closing inventories. During the years in question, a substantial portion of petitioner's gross income was realized from each class of business.

During the fiscal year 1917, petitioner's gross profits from sales amounted to $141,765.41, of which $93,395.17 was realized from sales in carload lots, and $48,370.24 was realized from sales of goods shipped from the warehouse.

During the fiscal year ended in 1918, petitioner's gross profits from sales amounted to $144,349.66, of which $65,941.86 was from sales in carload lots, and $78,407.80 was from sales of goods shipped from the warehouse.

Thus, for the fiscal year 1917, more than 34 per cent of petitioner's gross income was realized from the sale of goods shipped from its warehouse, and for the fiscal year 1918, more than 54 per cent of its gross income was realized from the same source.

Petitioner's invested capital for the fiscal year ended in 1917 was $14,252.55, and for the fiscal year ended in 1918, its invested capital was $44,391.98.

While it is clearly shown by the evidence that petitioner handled its sales in carload lots on borrowed capital, we are not informed as to how it financed that portion of its business represented by sales in less than carload lots, shipped from its warehouse. The facts would seem to justify the inference that its invested capital was used in carrying its warehouse stock, and counsel for petitioner in connection with argument in its brief in effect directly assumed such fact. However, if this assumption is not correct, then we do not know how its invested capital was employed, as otherwise on this point the record before us is silent. If the petitioner's invested capital was used directly in handling that portion of its business consisting of sales of goods shipped directly from its warehouse, which produced an average of more than 44 per cent of its total gross income for the years under consideration, we must conclude that its invested capital was more than nominal. If this assumption is incorrect, then we

must hold that the petitioner has failed to establish its case on the first issue, for the reason that it has not shown that its invested capital was not used directly and to a substantial extent in the production of its taxable income.

The Revenue Act of 1917, in section 201, imposed a war-excess-profits tax upon corporations and others according to a graduated scale, beginning with 20 per centum of the amount of the net income in excess of the deductions and not in excess of 15 per centum of the invested capital for the taxable year. In the event that the invested capital could not be satisfactorily determined, it was provided in section 210 that the profits tax should be computed on a comparative basis; and in section 209, it was provided that in the case of a trade or business having no invested capital or not more than a nominal capital, the profits tax should be computed at 8 per centum of the net income in excess of the deductions. Thus, section 209 excepts those coming within its terms from the higher rates imposed by section 201 or section 210. Petitioner herein is seeking to bring itself within the scope of the exception and the burden is therefore upon it to establish that fact by a preponderance of the evidence.

In *Hubbard-Ragsdale Co.* v. *Dean, supra,* the court, in considering a similar situation, said:

The plaintiff claims the benefit of an exception to the general method and extent of taxing corporations. The burden is upon the plaintiff to show that it clearly comes within the terms of such exception. In such cases, a reasonable doubt is fatal to the claim. Prima facie every presumption is against it. It is only when the terms of the concession are too explicit to admit fairly of any other construction that the proposition can be supported.

We are not satisfied, from a consideration of all the facts and circumstances of this case, that the petitioner has brought itself within the purview of section 209, and the decision of the first issue must, therefore, go against it. Accordingly, the action of the respondent in computing petitioner's excess-profits tax for the portions of the fiscal years ended in 1917 and 1918 falling within the calendar year 1917, under the provisions of section 210 of the Revenue Act of 1917, is approved.

*Second issue.* Is the petitioner entitled to have reflected in the computation of its invested capital, for the fiscal years ended in 1919 and 1920, the actual cash value of certain promissory notes given by the stockholders for shares of stock issued to them?

On September 5, 1918, the petitioner increased its authorized common stock from $5,000 to $125,000. Of the $120,000 additional common stock, it issued $75,000 as a stock dividend, each stockholder receiving his proportionate part on the basis of his former holdings.

The balance of the additional common stock, of the par value of $45,000, was issued to the stockholders for their promissory notes, payable one year after date, with interest at the rate of 6 per cent per annum. Petitioner contends that it is entitled to have the face value of the notes in the amount of $45,000, included in its invested capital for the purpose of computing its profits tax for the fiscal years ended in 1919 and 1920. The respondent refused to include the notes in petitioner's invested capital, but allowed the full amount of all payments made on the notes from the dates of such payments. Respondent urges that the petitioner is not entitled to have the notes included in its invested capital for the years in question, either at their face value or in any amount, for two principal reasons: First, because the statutes of the State of Missouri provide that no note given by any stockholder of a corporation shall be considered as payment of any part of the capital stock; and second, because the notes were not otherwise *bona fide* paid in for stock.

The Revenue Act of 1918 provides, in section 326 (a), that invested capital for any year means, among other things, (1) actual cash *bona fide* paid in for stock or shares, and (2) actual cash value of tangible property other than cash, *bona fide* paid in for stock or shares, at the time of such payment. Section 325 (a) of the same Act provides that the term "tangible property" means, among other things, notes and other evidences of indebtedness.

Under the provisions of the sections of the Act referred to, petitioner is clearly entitled to have included in its invested capital the actual cash value of the notes in question, at the time they were paid in, if they were in fact *bona fide* paid in for stock or shares. As affecting the question of whether the notes were so *bona fide* paid in, we will consider first the provisions of the Missouri statutes (Revised Statutes of Missouri, 1919), which in pertinent parts read as follows:

Sec. 9740. * * * The stock or bonds of a corporation shall be issued only for money paid, labor done or property actually received. * * *

Sec. 10155. * * * No note or obligation given by any stockholder, whether secured by deed of trust, mortgage or otherwise, shall be considered as payment of any part of the capital stock, and no loan of money shall be made by the corporation to any stockholder therein * * *

Our attention has not been called to, nor have we been able to find, any reported case in which the Missouri courts have passed on the validity of a note given for stock of a Missouri corporation, contrary to the above-quoted statutory provisions. However, the New York Stock Corporation Law contains a similar provision, in that it prohibits any stock corporation or officer thereof from receiving any note or other evidence of debt in payment of any installment or any part thereof due or to become due on any stock in such corporation;

and in considering the effect of the New York State law, we said, in the *Appeal of Hewitt Rubber Co.*, 1 B. T. A. 424, at page 430:

We reach the conclusion that Congress intended by the language used in section 326 (a) [Revenue Act of 1918] that for the purpose of computing the profits tax, notes in reality and without fraud or collusion paid in for stock should be included in invested capital unless such *sale* of stock is rendered absolutely void by positive statute.

We do not believe that the New York State statutes relating to the issuance and sale of stock in any way conflict with the conclusion reached because:

(1) Congress has laid down a rule in clear and unambiguous terms for determining invested capital of corporations and where all requirements of that rule are met, a State statute imposing certain restrictions upon corporations for the purpose of enforcing full payment for its stock, designed and intended to serve an entirely different purpose, can not operate to nullify the plain provisions of the Federal statute.

(2) The statutes of the State of New York do not make *void* a *bona fide* sale of an original issue of stock by a corporation paid for by a promissory note of a responsible and solvent maker. They were intended merely to circumscribe the transaction with certain restrictions to prevent fictitious sales, to enforce full payment of subscriptions and to make the directors and officers personally liable for the protection of stockholders and creditors of the corporation.

This same question was considered at length in *Max Kaufman & Co.* v. *Bowers*, 11 Fed. (2d) 662; 5 Am. Fed. Tax Rep. 5909, and the court reached the conclusion " that, while the directors may have violated the provisions of the New York State law, and thereby subjected themselves to possible penalties, that fact would not make the notes void. * * * The notes were enforceable in the hands of the corporation."

The statutes of Pennsylvania provide (P. L. 30, sec. 4) that " no such corporation shall issue either bonds or stock except for money, labor done, or money or property actually received, and all fictitious increase of stock or indebtedness in any form shall be void; " and (P. L. 56, sec. 1) that " No note or obligation given by a stockholder, whether secured by pledge or otherwise, shall be considered as a payment of any part of the capital stock."

In considering the effect of the Pennsylvania statutes above quoted, we held in *American Steel Co.*, 1 B. T. A. 839, that they did not make void a *bona fide* sale of stock for a note, and that such a note was enforceable by the corporation against the maker thereof, citing authorities.

The same rule applies in the instant case, and we, therefore, hold that the Missouri statutes do not operate to prevent the inclusion of the actual cash value of the notes in question in petitioner's invested capital for the fiscal years 1919 and 1920, under section 326 (a) of the Revenue Act of 1918, if they were in fact *bona fide* paid in for stock.

There remains for consideration, then, only the question of whether the notes were *bona fide* paid in for stock, and if so, the actual cash value thereof at the time of such payment.

The evidence shows that the notes were dated September 5, 1918, and were due and payable one year after date, with interest at the rate of 6 per cent per annum. The makers of the notes were at all times fully able financially to pay them. When the notes matured and became payable on September 5, 1919, the sum of $3,500 had been paid and credited on the note given Parnham for the stock issued in his wife's name. This was less than one-half of the principal amount of the note, and the payments were made by charges against the credit balance of Parnham's account on the petitioner's books. No payments whatever had been made at that time on the other notes, except interest. The record before us does not disclose that the petitioner treated the notes in a practical way as capital assets, or used them in its business as a basis for credit, or in any other manner; nor does the record show that any demand for payment of the notes was made. On July 19, 1920, more than 10 months after the notes became due, petitioner declared a cash dividend in the amount of $13,686.29, which the stockholders applied as payments on their notes. Parnham continued to make payments on his note, by charging the sum of $350 per month against the credit balance of his account, until the full amount of $7,620.48 had been paid, together with the interest. This sum, plus the dividend of $13,686.29 made a total of $21,306.77 paid on the notes, and the unpaid balance of $23,693.23 was finally canceled by the corporation and a proportionate amount of the stock retired on December 30, 1921, more than two years and three months after the notes had become past due. During all of this time the petitioner continued to borrow money from the bank on which to operate its business, paying the bank interest at the rate of 8 per cent per annum, while the notes of the stockholders bore interest at the rate of 6 per cent per annum, and no demand for payment of the notes was made, although the makers were solvent and able to pay them.

In the case of *Max Kaufman & Co.* v. *Bowers, supra,* it was held that interest-bearing demand notes, given to a New York corporation in good faith for stock, were properly included in invested capital. However, the court in its opinion laid stress on the fact that " the notes were actual assets of the corporation, and were subsequently fully paid in cash," and that " they were actually used as money capital, being made the basis of buying credits."

In the *Appeal of Hewitt Rubber Co., supra,* we held that an interest-bearing demand promissory note of a responsible and solvent

maker actually and in good faith paid in for stock constituted invested capital. In that connection, we said:

The evidence introduced by taxpayer clearly shows that the sale of the 10,000 shares of 8 per cent cumulative preferred stock by the taxpayer and the purchase thereof at par by H. H. Hewitt and paid for by his demand note for $1,000,000 was a real transaction, entered into in good faith, without fraud, deceit, or collusion; that the stock was actually and in good faith issued by the corporation to Mr. Hewitt; that the $1,000,000 demand note was carried on the books of taxpayer as an asset; that the regular quarterly dividends were paid on the stock, and that the entire note with interest was paid within the year. There is not a scintilla of evidence in the record to indicate that the purchase and sale of the stock was *mala fide;* not a real transaction, or that it was not entered into in good faith, and for the best interests of the taxpayer.

Cf. *Appeal of American Steel Co.,* 1 B. T. A. 839; *Cross Mountain Coal Co.* 2 B. T. A. 587.

In the *Appeal of Stamey-Mackey Construction Co.,* 4 B. T. A. 383, we held that interest-bearing demand promissory notes of solvent and responsible makers, actually and *bona fide* paid in for preferred stock of a Kansas corporation constituted invested capital. In considering the *bona fides* of the transaction in that case, we said:

The case for the petitioner in the present appeal is stronger than in the *Cross Mountain Co.* appeal, for here we have the petitioner making use of the notes to increase its working capital. There is nothing in the record to show that this transaction was not entirely in good faith between the petitioner and the holders of its preferred stock; that it was not a real transaction, or that it was not entered into for the best interests of the petitioner.

In the *Appeal of Citizens Underwriters Agency,* 2 B. T. A. 1116, we found, *inter alia,* the following facts:

The taxpayer carried on its books, as bills receivable, $5,350, representing demand notes from stockholders given in 1907 for stock. These notes were never paid, although the makers were financially responsible, nor was demand ever made for payment, the taxpayer having borrowed money for its own use during the period.

We held that the notes in that case were not *bona fide* paid in for stock.

In the case under consideration, the makers of the notes were the stockholders, directors and officers of the corporation, and had the full and unrestricted control of its affairs. No cash payments were ever made at any time on the notes, other than the cash dividend declared by petitioner, which appears to have been passed to the credit of the stockholders and then charged against their accounts as payments on the notes. With the exception of the Parnham note, on which $3,500 was paid by charges against his account, no payment of any kind was made on the notes until long after they were past due. The makers of the notes, in their capacity as officers of the corporation, did not permit petitioner to use the notes to increase

its working capital, notwithstanding the fact that during the entire period intervening between the date of the notes and the date of their cancellation more than three years later petitioner was in such urgent need of additional capital that it was compelled to borrow money from the bank at a higher rate of interest than that received by it on the notes.

In the light of these facts, we are impelled to the conclusion that the notes in question were not *bona fide* paid in for stock or shares.

It follows that the action of the respondent in regard to the second issue is affirmed.

*Judgment will be entered for the respondent.*

Considered by SMITH and LITTLETON.